1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9    ARTHUR L. SCHIEL,

10            Plaintiff,                    No. CIV S-04-2410 MCE GGH

11        vs.

12   JO ANNE B. BARNHART,
     Commissioner of Social
13   Security,
                                    FINDINGS AND RECOMMENDATIONS
14
              Defendant.
15   _____/

16            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits

18   ("DIB") under Title II of the Social Security Act ("Act").  For the reasons that follow, the court

19   recommends plaintiff's Motion for Summary Judgment or Remand be denied, the

20   Commissioner's Cross Motion for Summary Judgment be granted, and judgment be entered for

21   the Commissioner.

22   BACKGROUND

23            Plaintiff, born January 26, 1945, applied for disability benefits on January 7, 2000,

24   with a protective filing date of December 21, 1999. (Tr. at 218, 16.)  Plaintiff alleged he was

25   unable to work since June 1, 1994, due to back injury, sciatic nerve pain, and shoulder injury.

26   (Tr. at 257.)  ALJ Charles D. Reite determined plaintiff was not disabled on December 3, 2001.

                                              1

(Tr. at 96.)  The Appeals Council granted plaintiff's request for review and remanded the case for further evaluation of plaintiff's mental impairments, further consideration of plaintiff's maximum residual functional capacity, and to obtain evidence from a medical expert regarding the nature and severity of plaintiff's impairments.  (Tr. at 190-91.)

After a new hearing on September 11, 2003, ALJ Reite determined that plaintiff was not disabled in a decision dated December 23, 2003.[1]  The ALJ made the following findings:

> 1.  The claimant met the disability insured status requirements of the Act on June 1, 1994 and continued to meet them through his date last insured of December 31, 1999.
>
> 2.  The claimant has not engaged in substantial gainful activity since June 1, 1994.
>
> 3.  The medical evidence establishes that claimant has the following severe impairments: lumbar degenerative disc

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

disease; left shoulder injury in 1979, by history; bipolar disorder; and paranoid personality disorder.

4.  Substance addiction is not a contributing material factor.

5.  Claimant does not have any of the related clinical findings so as to meet or equal the level of severity in the listings in Appendix 1, Subpart P, Regulations No. 4.

6.  Claimant's subjective complaints are not credible.

7.  Claimant has the residual functional capacity for light work, and no work above shoulder level with regard to the non-dominant left upper extremity, and limited to 5 pounds occasional use of the left upper extremity below shoulder level, and able to do occasional stooping, crouching, kneeling and crawling, and mildly limited with regard to concentration, persistence and pace, and social interaction.

8.  Claimant is unable to perform his past relevant work.

9.  Claimant is presently 58 years old, which is defined as a person of advanced age.  On his date last insured of December 31, 1999, he was 54 years old, which is defined as a person closely approaching advanced age.  On his alleged onset date of June 1, 1994, he was 49 years old, which is defined as a younger person (20 CFR 404.1520).

10. Claimant completed the eleventh grade (20 CFR 404.1563).

11. Considering his residual functional capacity and vocational profile, there are other jobs existing in significant numbers in the national and regional economies that claimant could perform, based on the vocational expert testimony.

12. Claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520).

(Tr. at 22.)

ISSUES PRESENTED

Plaintiff has raised the following issues:  A.  Whether the ALJ's Findings Regarding Plaintiff's Mental Impairments Were Supported By Substantial Evidence; and B. Whether the ALJ's Findings Regarding Plaintiff's Exertional Residual Functional Capacity Were Supported by Substantial Evidence and Reached With Proper Application of Law.

3

1  LEGAL STANDARDS

2          The court reviews the Commissioner's decision to determine whether (1) it is

3  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

4  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

5  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

6  Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

7  accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

8  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

9  (1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

10  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

11  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

12  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

13  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

14  ANALYSIS

15      A.  The ALJ's Findings Regarding Plaintiff's Mental Impairments Were Supported By

16  Substantial Evidence

17          Plaintiff contends that the ALJ did not completely follow the Appeals Council's

18  directions to obtain medical expert evidence regarding plaintiff's mental impairment, and that

19  there was evidence of mental problems prior to plaintiff's last insured date.

20          This claim of error cannot be rectified by this court which is vested with authority

21  only to determine whether the final decision of the Commissioner is supported by substantial

22  evidence and performed under correct legal standards.  42 U.S.C. § 405(g).  A well accepted

23  tenet governing judicial review of social security decisions is the principle that, when the

24  Appeals Council denies review, the decision of the ALJ is the final decision.  Andrews v. Shalala,

25  53 F.3d 1035, 1039 (9th Cir. 1995);  O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994);

26  Keeton v. Dep't of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Browning

1   v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); Russell v. Brown, 856 F.2d 81, 83-84 (9th Cir.

2   1988); 20 C.F.R. §§ 404.955; 404.967 et seq.; 416.1455; 416.1467 et seq.

3             In the instant case, since the Appeals Council denied review after the ALJ's

4   decision on remand, it apparently concluded either that the ALJ properly followed its remand

5   instructions, or any failure by the ALJ to follow its instructions was not worth overturning.

6   Whether the ALJ erred on remand is beside the point because the ALJ's decision is the final

7   decision of the Secretary.  The question at this stage is whether the final decision of the

8   Secretary, or the ALJ's decision on remand in this case, is supported by substantial evidence.

9             As background information only, the following transpired at the time of remand.

10  The Appeals Council gave the following directions to the ALJ:

11            Further evaluate the claimant's mental impairments in accordance
              with the special technique described in 20 CFR 404.1520a and
12            document application of the technique in the decision by providing
              specific findings and appropriate rationale for each of the
13            functional areas described in 20 CFR 404.1520a(c).

14            Give further consideration to the claimant's maximum residual
              functional capacity and provide appropriate rationale with specific
15            references to evidence of record in support of the assessed
              limitations (20 CFR 404.1545 and Social Security Ruling 96-8p).
16
              Obtain evidence from a medical expert to clarify the nature and
17            severity of the claimant's impairments (20 CFR 404.1527(f)) and
              Social Security Ruling 96-6p).
18

19  (Tr. at 190-91.)

20             The remainder of the opinion focused on the ALJ's failure to develop this area of

21  which plaintiff appeared to have a lengthy history.  Prior to the three specific directions cited

22  above, the Appeals Council stated, "as this evidence suggests the claimant's mental impairment

23  is more severe that [sic] the Judge assessed, further evaluation is needed."  (Tr. at 190.)  On

24  remand, the only medical expert obtained by the ALJ to provide testimony was a specialist in

25  orthopedics and other physical impairments.  (Tr. at 36.)  In fact, plaintiff's counsel questioned

26  the ALJ about the lack of a mental health expert at the hearing despite the Appeals Council's

5

1    instructions, and the ALJ responded that he would go ahead with the hearing because everyone

2    was already assembled.  (Tr. at 32.)  He said another supplemental hearing could be arranged as

3    well if it was necessary.  (Id.)

4            Nevertheless, after remand the ALJ did obtain two consultative evaluations, by

5    psychiatrist Dr. Auluck and psychologist Dr. Cushman.  Furthermore, the ALJ did explain in his

6    decision that although he had received updated mental health evidence which he added to the

7    record, this evidence showed only that plaintiff had current mental problems, but there was no

8    evidence suggesting a mental impairment prior to the last insured date.  (Tr. at 18.)[2]

9            The ALJ spent much time discussing the mental health records and how they

10   concern only the period after December 31, 1999.  All of the mental health treatment evidence

11   proffered by plaintiff in his current motion is dated after plaintiff's last insured date of December

12   31, 1999.  Plaintiff's Motion, at 2-3.  Although certain medical records refer to plaintiff's history

13   of mental problems predating this last insured date, there is no actual medical evidence of earlier

14   problems, other than plaintiff's own accounts, and plaintiff has raised no issue disputing the

15   ALJ's finding that plaintiff is not credible.  The only hard evidence of any mental problem prior

16   to December 31, 1999 is a 1995 arrest for assault and battery, but as explained by the ALJ, this

17   evidence alone is not sufficient to establish a mental impairment prior to the last insured date.

18   (Tr. at 20.)  Plaintiff contends that he was unable to find and submit evidence of past treatment

19   and that any institutions which would have treated plaintiff are no longer in existence.

20   Nevertheless, plaintiff bears the burden of proof in the first four steps of the sequential evaluation

21   process.  Bowen v. Yuckert, supra, 482 U.S. at 146, n.5.

22           The evidence submitted by plaintiff which is closest in time to his date last

23   insured is from Dr. McKnight, a consulting psychiatrist.  This evaluation, dated January 13,

24   2001, was based on plaintiff's reports, and not on any medical records.  In fact, although plaintiff

25

26       [2]  As discussed, infra, an expert present at hearing, with no records to review from the
     pertinent time period, would not have been helpful.

6

1  reported he was hospitalized as a teenager and given shock treatments, he did not mention any

2  other recent treatment which would have occurred during his adult work years and which would

3  have preceded his last insured date.  (Tr. at 473.)  At this time, plaintiff was diagnosed with

4  bipolar disorder and assigned a GAF of 50.[3]  Dr. McKnight concluded, based on plaintiff's

5  representations and his own evaluation, that plaintiff's history "over about the last ten years is

6  compatible with the agitated manic."  (Id.)  This psychiatrist explained further:

> He on several occasions felt like doing violence to either strangers
> or to fellow workers.  He also was carrying on sexual affairs and
> doing a lot of gambling.  He seems to be better controlled now on
> medication, but he is also in a very stable environment where he
> does not have very much exposure to other people, so it unknown
> [sic] how well he would be able to control his temper at this time.
> I feel that for him to go to work at another job where he would be
> exposed to a boss or fellow workers or the public where he might
> try to do violence on them would be both detrimental to him and to
> the public.

13  (Id. at 473-74.)

14       It is true that Dr. McKnight thought that plaintiff's mental health history as a

15  "manic" dated back ten years; however, all of his evaluation is based on plaintiff's subjective

16  reporting which the ALJ found to be "totally uncorroborated, self-serving and incredible," and

17  which determination has not been contested in plaintiff's motion.  Therefore, the court cannot

18  find based on this report dated more than one year after plaintiff's last insured date, that plaintiff

19  was disabled prior to that time.

20       Although the ALJ did not call a testifying expert on mental impairments, he did

21  receive updated evidence, including two consultative reports which were conducted after the

22  remand.  Dr. Auluck, a psychiatrist, performed an evaluation for the Department of Social

23

_____

24       [3]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
25  Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 41-50 indicates
serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in
26  social, work, or school functioning.  Id.

1  Services on June 18, 2002.  He diagnosed bipolar disorder and a GAF of 60.[4]  (Tr. at 485.)  The

2  doctor noted that although plaintiff reported having depression since the age of 24, it appears to

3  have worsened after suffering physical injuries in 1994.  Although having been treated with

4  Nortryptiline and Lithium, plaintiff was not taking these medications because he could not afford

5  the copayments.  (Id. at 483, 485.)

6          The fact that plaintiff could not afford medical care does not cause the burden to

7  fall on the Commissioner to further develop the record.  The record has been sufficiently

8  developed to make a determination.  Any argument that plaintiff was not taking medication

9  because he could not afford the copayments is inapposite.  Social Security Ruling 82-59[5] "only

10  ————————————

11      [4] A GAF of 60 indicates moderate symptoms such as flat affect, circumstantial speech,
    occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with
12  peers or co-workers.  Id.

13      [5] SSR 82-59 provides in relevant part (emphasis added):

14      Individuals with a disabling impairment which is amenable to treatment that could be
    expected to restore their ability to work must follow the prescribed treatment to be found
15      under a disability, unless there is a justifiable cause for the failure to follow such
    treatment ...

16
        The underlying regulation, 20 C.F.R. § 416.930 (and companion regulation 20
17  C.F.R. § 404.1530 under Title II) similarly provides:

18      (b) When you do not follow prescribed treatment.  If you do not follow the prescribed
    treatment without a good reason, we will not find you disabled ...
19
        Both 20 C.F.R. § 416.930 and SSR 82-59 identify specific acceptable reasons for
20  declining to following prescribed treatment, none of which are present here.

21      20 C.F.R. § 416.930(c) sets forth the following examples of acceptable reasons for
    declining to following prescribed treatment:
22
        (1) The specific medical treatment is contrary to the established
23      teaching and tenets of your religion.
        (2) The prescribed treatment would be cataract surgery for one eye when
24      there is an impairment of the other eye resulting in a severe loss of vision
        and is not subject to improvement through treatment.
25      (3) Surgery was previously performed with unsuccessful results and the
        same surgery is again being recommended for the same impairment.
26      (4) The treatment because of the enormity (e.g. open heart surgery),

                                            8

1  appl[ies] to claimants who would otherwise be disabled within the meaning of the Act."  Roberts

2  v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).  The ALJ made a specific finding that plaintiff was

3  not disabled without regard to his failure to seek treatment.

4          Dr. Cushman, a psychologist, also examined plaintiff after the remand, on June

5  30, 2002, at the ALJ's request.  Plaintiff reported that he had inpatient psychiatric treatment as a

6  teenager, but not as an adult.  (Tr. at 488.)  He has received outpatient psychiatric care as an

7  adult, however.  (Id.)  When he was 13, plaintiff stated he was picked up by police and put in the

8  L.A. County General Hospital Psych Ward for a month.  He stated that he also was placed at

9  Atascadero Hospital when he was 13; however, Dr. Cushman doubted the veracity of this

10 statement because he did not think Atascadero accepted individuals under 18 years, even during

11 that time period.  (Id. at 489.)  Plaintiff stated on this physician's questionnaire that he was taking

12 Lithium but then during the interview he admitted he had not taken it in six months because he

13 could not afford it.  (Id. at 492.)  Also, the medications he was presently taking could lead to

14 extreme irritability, according to Dr. Cushman.  (Id.)  Plaintiff's verbal and performance IQ were

15 28 points apart on two tests.  He also made the following conclusions:

16          The MMPI-2, unfortunately, produced an invalid (fake bad) profile
            that thereby sheds little light on his current psychology.  He did not
17          present as particularly depressed or particularly hyperactive
            (mania) today.  I have a hard time diagnosing him with the Bipolar
18          Mood Disorder.  On the other hand, I have seen patients with
            Bipolar Mood Disorder with a similar split between the verbal and
19          performance IQs.  I suspect, however, a more likely scenario is
            some form of brain damage affecting the right hemispheric cerebral

20

21          unusual nature (e.g. organ transplant), or other reason is very risky
            for you; or
22          (5) The treatment involves amputation of an extremity, or a major
            part of an extremity.

23

24  Additional acceptable reasons for declining to following prescribed treatment set forth in
    SSR 82-59 are:

25          (1) Fear of surgery;
            (2) Inability to pay for prescribed treatment;
26          (3) A medical source has advised against the treatment.

9

1  cortex with subsequent influence on his behavior, particularly
   impulsive, emotional rages.  Based on the results of today's test, I
2  would recommend a neurological evaluation including imaging
   techniques such as CT-scan or MRI and full neurological
3  examination.  The MMPI could also be readministered with a
   caution to Mr. Schiel as to his prior bias in responding 'true' to so
4  many questions.

5  (Id. at 493.)  His diagnosis was cognitive disorder NOS, opioid dependence, opioid induced

6  mood disorder, chronic pain disorder, paranoid personality disorder, and a GAF score of 50.  (Id.)

7  Dr. Cushman also assessed plaintiff's functional capacity based on his mental limitations.  (Id. at

8  494.)  He thought plaintiff could perform some simple and repetitive as well as complex and

9  detailed tasks of a verbal nature, but could not perform even simple visual motor tasks without

10 difficulty.  Plaintiff was not motivated to work and so would have difficulties with all tasks.  He

11 could not work at the present time due to mood problems and pain.  He would also have

12 problems dealing with coworkers, the public, and the usual stressors of work.  Dr. Cushman

13 thought that with aggressive psychiatric treatment, plaintiff could work in six to nine months.

14 (Id.)

15         Although both of the recent psychiatric reports are current and comprehensive,

16 they do not address plaintiff's mental state prior to the end of his insured period.

17         Plaintiff contends that Dr. Cushman's reference to brain damage shows an organic

18 mental impairment which contradicts the ALJ's finding that mental problems began only after

19 plaintiff's last insured date.  Plaintiff also refers to a psychiatric consultation conducted in

20 January, 2001 by Dr. McKnight which noted a paranoid personality disorder, which plaintiff

21 argues indicates an origin which is not recent.  (Tr. at 467.)  Even if plaintiff were to persuade the

22 court that his condition is organic in nature, how, without medical records predating his last

23 insured period, would a medical specialist determine the inception date of any brain damage, and

24 more importantly, its effects at any particular point in time?  Dr. Cushman suggests that a CT-

25 scan or MRI be administered with a full neurological evaluation; however, assuming such

26 thorough tests are administered, how would an onset date be determined?  Without prior records,

10

1  there is no way to answer this question.  The ALJ's duty extends only so far.  He is to develop a

2  record, not create one.  To put it another way, as the Commissioner argues, even if the ALJ had

3  obtained a medical expert for the mental health issues or obtained objective neurological testing,

4  there would have been no record to review and no way to determine plaintiff's mental status prior

5  to December 31, 1999, and therefore any failure by the ALJ to do so was harmless.  An error

6  which has no effect on the ultimate decision is harmless.  Curry v. Sullivan, 925 F.2d 1127, 1121

7  (9th Cir. 1990).

8          Mental health records closest to plaintiff's last insured date are from March, 2000.

9  (Tr. at 467.)  At the initial interview, it was noted that the following disorders should be ruled

10  out: major depression, paranoid delusions, and paranoid personality disorder.  (Id.)  On March

11  30, 2000, the impression was probable bipolar disorder and paranoid traits.  (Id. at 464.)

12  Although plaintiff was receiving treatment from Kaiser prior to his last insured date, there is no

13  record of mental health treatment predating December 31, 1999.  See Tr. 376-441.  In fact, a

14  psychiatric review technique form, dated June 5, 2000, states that there is insufficient mental

15  record evidence to make a determination.  (Tr. at 442-43.)  At an August 16, 2000 visit, Dr.

16  Prime, plaintiff's treating psychiatrist at Kaiser, reported that plaintiff was taking Seroquel and

17  Lithobid and was to discontinue Neurontin.  Plaintiff reported that his mood was good and stable,

18  that his sleeping had improved to six to eight hours a night, and that his energy improved.  (Tr. at

19  461.)

20          At the second administrative hearing, the ALJ specifically asked plaintiff's

21  counsel whether there were medical records available for the period prior to December, 1999, but

22  plaintiff's attorney responded in the negative.  (Tr. at 28.)  The ALJ discussed this lack of

23  evidence in his second decision, also mentioning the coincidental timing of mental health

24  treatment.  He took note of the fact that the first treatment note, dated March 21, 2000, was after

25  the last insured date of December 31, 1999, and about two weeks after the initial March 9, 2000

26  \\\\\

11

1   denial of the current application.  He further noted that plaintiff's initial application for benefits

2   and related forms make no mention of any mental problems.  (Tr. at 20.)

3        In sum, the ALJ thoroughly considered all the medical records, including

4   additional evidence obtained by him on remand, and substantial evidence supports his findings

5   regarding plaintiff's mental impairment.

6        B.   The ALJ's Assessment of Plaintiff's Residual Functional Capacity and His Decision

7   That Plaintiff Could Do His Past Work At Step Four Is Supported by Substantial Evidence

8        Plaintiff next contends that the ALJ's finding that he could do light work was not

9   supported by substantial evidence, was contradicted by evidence which was improperly

10  discounted, and that the ALJ failed to consider the effects of obesity and hypertension in making

11  this finding.

12       Light work involves lifting no more than 20 pounds at a time with frequent lifting

13  or carrying of objects weighing up to 10 pounds while mainly standing and walking.  20 CFR

14  404.1567(b).

15       The ALJ found that plaintiff could do light work, "and no work above shoulder

16  level with regard to the non-dominant left upper extremity, and limited to 5 pounds occasional

17  use of the left upper extremity below shoulder level, and able to do occasional stooping,

18  crouching, kneeling and crawling, and mildly limited with regard to concentration, persistence

19  and pace, and social interaction."  (Tr. at 19, 22.)  Based on this residual functional capacity, the

20  ALJ found that, according to the vocational expert's testimony, plaintiff could not do his past

21  work because as a security guard he had to lift bags of coins, but could do other work as a

22  security guard, cleaner, polisher, masker, or as an assembler.  (Id. at 21.)

23       The ALJ also referred to the medical expert's findings that plaintiff had a higher

24  residual functional capacity than the ALJ hypothesized to the vocational expert.  This testifying

25  expert, Dr. Karbelnig, an orthopedic surgeon, relied on two reports authored by plaintiff's

26  treating orthopedist, Dr. Oda, in drawing his conclusion that plaintiff could do light work.  (Tr. at

12

39, 40.)  Dr. Oda had stated on October 2, 1995, that plaintiff was a candidate for vocational

rehabilitation and had already commenced the process.  (Tr. at 333.)  This physician also stated

that plaintiff would probably not be able to return to his past work, and that she had *concerns*

with standing and walking and plaintiff's ability to respond to emergencies.[6]  (Id.) (Emphasis

added.)  In addition, Dr. Oda noted that plaintiff should be precluded from heavy lifting and had

slightly diminished range of motion of his back.  (Id.)  The other report relied upon by Dr.

Karbelnig was a December 29,1994 evaluation by Dr. Oda which stated that in addition to the

degenerative disc disease, an MRI showed an osteophyte abutting the left L3 nerve root which

was probably causing pain in plaintiff's left thigh.  (Tr. at 321.)  Based on this finding, plaintiff's

condition was not yet permanent and stationary.  Plaintiff was advised to undergo an EMG and

possible surgery.  Dr. Oda predicted that plaintiff's condition would become permanent and

stationary if surgery was not obtained within three months or six to twelve months after surgery

was performed.  (Id.)

        Based on these reports, Dr. Karbelnig concluded that plaintiff could do lighter

work, including standing or walking for six hours of an eight hour day, frequent lifting of 10 to

12 pounds, and occasional lifting of 20 to 25 pounds.  (Id. at 41.)

        Contrary to the Commissioner's assertion that the ALJ was entitled to rely on the

medical expert's opinion that plaintiff could do light work, the ALJ correctly assured plaintiff at

the hearing that Dr. Karbelnig was outside of his expertise in assessing plaintiff's ability to do

certain job activities.  (Tr. at 39, 44.)  In fact, the ALJ's decision points out that the limits posed

to the vocational expert were more restrictive than what Dr. Karbelnig had opined plaintiff could

do in terms of residual functional capacity.  (Id. at 21.)  The vocational expert responded to the

---

[6] Plaintiff has mischaracterized this opinion by stating that Dr. Oda reported that "plaintiff could not perform the walking and standing for security guard work," citing the same record page.  The ALJ was not required to specifically reject Dr. Oda's opinion regarding her concerns over standing and walking because they were only concerns, and not specific limitations.

1    hypothetical which gave the same residual functional limitations as listed by the ALJ in his

2    decision, finding numerous jobs plaintiff could do.  (Tr. at 69-79.)

3              Also supporting the ALJ's decision that plaintiff could do light work was other

4    medical evidence, including negative treadmill and PFT tests.  (Tr. at 380, 394.)  The ALJ

5    additionally referred to Dr. Balance's opinion that plaintiff's left knee was quite unremarkable,

6    with good range of motion.  (Id. at 377.)  There was mild tenderness but it was not significant.

7    (Id.)  Furthermore, plaintiff's treating physican, Dr. Baciocco, opined on July 31, 1997 that

8    plaintiff could work as a teacher.  (Id. at 337.)  The ALJ noted that this statement was made three

9    years after plaintiff's alleged onset date.  (Id. at 21.)  The vocational expert testified that this job

10   was light work.  (Id. at 68.)

11             Other evidence in the record also supports the finding of light work.  Dr. Baciocco

12   referred to an x-ray in a June 22, 1994 which showed only mild narrowing of the L4-5 and L5-S1

13   disc spaces, but otherwise looked normal.  (Tr. at 373.)  A nerve conduction study of the back

14   and lower extremities on March 10, 1995 was normal, as was an EMG.  (Tr. at 324-27.)  On July

15   31, 1997, plaintiff complained of intermittent low back pain which was improving.  (Id. at 338.)

16   Muscle power was normal on both sides.  (Id.)

17             On August 19, 1997, plaintiff reported his back pain was much better.  (Tr. at

18   406.)  An MRI of the L-S spine did not show significant herniated disc.  Exam indicated normal

19   power.  (Id.)  Diagnosis was lumbar degenerative joint disease with no radiculopathy.  There was

20   no spinal stenosis.  (Id.)

21             The ALJ's decision that plaintiff could do light work with certain limitations is

22   supported by substantial evidence.

23       C.  Obesity and Hypertension

24             In the last paragraph of the section regarding residual functional capacity, plaintiff

25   for the first time raises the issue of obesity and hypertension, claiming that the ALJ failed to

26   consider them as severe impairments and to consider their limitation on plaintiff's exertional

14

capacity.  If these conditions are not severe impairments, there is no need to proceed with further

consideration of their impact on plaintiff's functional capacity.

An impairment is not severe only if it "would have no more than a minimal effect

on an individual's ability to work, even if the individual's age, education, or work experience

were specifically considered."  SSR 85-28.  The purpose of step two is to identify claimants

whose medical impairment is so slight that it is unlikely they would be disabled even if age,

education, and experience were taken into account.  Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct.

2287 (1987).  "The step-two inquiry is a de minimis screening device to dispose of groundless

claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

Plaintiff's cited case of Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003) analyzed

obesity at step three of the sequential analysis; however, in the recent Ninth Circuit case, Burch

v. Barnhart, 400 F.3d 676 (9th Cir. 2005), consideration of plaintiff's obesity at all stages was

analyzed in light of Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003).  The Celaya factors include

whether, despite plaintiff's failure to specifically raise obesity, it was raised as a disabling factor

in plaintiff's report of symptoms, whether it was clear from the record that the obesity was close

to the listing criterion, and could exacerbate the other alleged impairments, and whether the ALJ

should have been on notice of the need to develop the record on obesity due to plaintiff's pro se

status, in light of his observation of plaintiff and other information in the record.  Id. at 1182.

At five feet nine inches tall, plaintiff's weight fluctuated between 190 and 230

pounds.  Here, the court has reviewed the record for any indication of obesity and found only one

reference, an October 10, 1996 chart note which includes obesity as one of the diagnoses.  (Tr. at

422.)  Elsewhere, there are only a few pro forma notes by practitioners when conducting a

physical exam, which described plaintiff's general presentation.  On April 24, 1998, plaintiff's

weight was noted to be 222 pounds, and on December 22, 1999, plaintiff's weight was 230

pounds.  (Tr. at 403, 387.)  There was only one other substantive note in the entire record, dated

April 18, 1996: "[plaintiff] is encouraged to continue some weight reduction as well as exercises

1   for his low back." (Tr. at 338.)   There was no other reference, recommendation, or diagnosis in

2   this regard made at the time.  These notes comprise the sum total mention of obesity in the

3   record.  Furthermore, the record reflects that plaintiff's weight fluctuated and did not meet the

4   obesity criteria at certain times.  For example, on December 29, 1994, plaintiff weighed only 190

5   pounds.  (Tr. at 319.)  According to Social Security Ruling 02-01p, his body mass index (BMI)

6   of approximately 28.36 at this weight is not considered obese.[7]  Plaintiff's various filings with

7   the Social Security Administration did not raise obesity as an impairment, but only back injury,

8   chronic pain from sciatic nerve, rotator cuff injury, left knee injury, high blood pressure, high

9   triglycerides, and depression. (Tr. at 257, 277-80, 293.)  Neither plaintiff nor his counsel ever

10   formally attempted to change this description.

11          Moreover, plaintiff had counsel at both hearings, yet they did not question him

12   about his weight.  (Tr. at 103-04, 24.)

13          In this case, there was only one cursory diagnosis of obesity with no

14   recommendation, and no record of a BMI.  As explained by Social Security Ruling 02-01p:

15               When the evidence in a case does not include a diagnosis of
                 obesity, but does include clinical notes or other medical records
16               showing consistently high body weight or BMI, we may ask a
                 medical source to clarify whether the individual has obesity.
17               However, in most such cases we will use our judgment to establish
                 the presence of obesity based on the medical findings and other
18               evidence in the case record, even if a treating or examining source
                 has not indicated a diagnosis of obesity.
19

20          Furthermore, although SSR 02-01p makes clear that obesity is a disease that must

21   be considered when evaluating disability, and the "combined effects of obesity with other

22   impairments can be greater than the effects of each of the impairments considered separately,"

23   \\\\\

24

25          [7] "BMI is the ratio of an individual's weight in kilograms to the square of his or her
     height in meters (kg/m2).  For adults, both men and women, the Clinical Guidelines describe a
26   BMI of 25-29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity.'" SSR 02-01p.

1   the ALJ "will evaluate each case based on the information *in the case record*." (Id.) (emphasis

2   added).

3           "An ALJ is not required to discuss the combined effects of a claimant's

4   impairments or compare them to any listing in an equivalency determination, unless the claimant

5   presents evidence in an effort to establish equivalence." Burch, 400 F.3d at 683. Here, it is

6   significant that although plaintiff was examined by numerous physicians regarding his back and

7   knee problems, these specialists did not mention plaintiff's obesity or that it was impacting these

8   other problems or his functioning capacity. The ALJ is not omniscient, and was not required to

9   evaluate plaintiff's obesity based on the non-existent record of obesity presented here.  If plaintiff

10  was serious about his obesity as being a qualifying circumstance for disability, he and his counsel

11  should have done more to make it an explicit issue throughout the administrative proceedings.

12          In regard to plaintiff's claims of hypertension and its effect on his residual

13  functional capacity, the record does indicate numerous references to uncontrolled hypertension.

14  (Tr. at 374, 387, 413.)  Nevertheless, medications were adjusted accordingly, the treadmill stress

15  test was normal, and other diagnostic tests were negative for ischemia.  (Id. at 374, 385.)

16  Furthermore, plaintiff denied any cardiac symptoms.  (Id. at 374.)  Plaintiff's blood pressure did

17  come under control on September 15, 1999, at the time he was taking hydrochlorothiazide

18  ("HCTZ"), and more recently it was normal at 122/80 on March 23, 2000, after his last insured

19  date.  (Id. at 380, 390-91.)  Further, as with his obesity allegation, his counsel failed to raise the

20  issue of hypertension at either of the two hearings.  (Tr. at 63, 107 - 120, 147.)  Moreover, high

21  blood pressure is often characterized as "symptomless,"

22  www.nhlbi.nih.gov/hbp/detect/know.htm, which by definition would not have a functional

23  aspect.  Plaintiff has not set forth how a condition such as hypertension has impacted his

24  functional capacity.  He has some burden to set forth how it prevents him from doing any

25  activity.

26  \\\\\

1    D.  Application of the Grids

2         In his "conclusion" section, plaintiff for the first time raises the issue that because

3    he was 54 years and 11 months at his last insured date, the ALJ should have considered whether

4    he was disabled because the grids mandate a finding of disability at age 55 if the plaintiff is

5    capable of light or sedentary work.  Because plaintiff's age was borderline, plaintiff argues that

6    the ALJ should not have mechanically applied the age boundaries in the rules.

7         The Guidelines in table form ("grids") are combinations of residual functional

8    capacity, age, education, and work experience.  At the fifth step of the sequential analysis, the

9    grids determine if other work is available.  See generally Desrosiers v. Secretary of Health and

10   Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

11        The grids may be used if a claimant has both exertional and nonexertional

12   limitations, so long as the nonexertional limitations do not significantly impact the exertional

13   capabilities.[8]  Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds,

14   Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  The ALJ, however, is not

15   automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional

16   limitation.  Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged

17   does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, §

18   200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience,

19   education, and psychological and physical impairments to determine whether a nonexertional

20   limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846

21

22        [8] Exertional capabilities are the "primary strength activities" of sitting, standing, walking,
     lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary;
23   Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include
     mental, sensory, postural, manipulative and environmental matters which do not directly affect
24   the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper,
     880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has
25   an impairment that limits his or her ability to work without directly affecting his or her strength,
     the claimant is said to have nonexertional (not strength-related) limitations that are not covered
26   by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

18

1 F.2d at 578 (Pregerson, J., concurring).  If so, the ALJ must use a vocational expert. <u>Aukland v.</u>

2 <u>Massanari</u>, 257  F. 3d. 1033 (9th Cir. 2001).

3            If the grids for plaintiff's actual age of 54 at the time of his last insured date (or

4 his age of 49 at the time of his alleged onset date) are applied, Rule 202.11 mandates a finding of

5 not disabled.  If plaintiff's age one month after his last insured date is applied, Rule 202.02

6 requires that plaintiff be found disabled.  Here, because the ALJ relied on a vocational expert in

7 addition to the grids to assess plaintiff's capacity for work, and because his finding of light work

8 was carefully limited by the restrictions of "no work above shoulder level with regard to the non-

9 dominant left upper extremity, and limited to 5 pounds occasional use of the left upper extremity

10 below shoulder level, and able to do occasional stooping, crouching, kneeling and crawling, and

11 mildly limited with regard to concentration, persistence and pace, and social interaction," his

12 decision is supported by substantial evidence.

13 <u>CONCLUSION</u>

14            The court finds the ALJ's assessment to be fully supported by substantial evidence

15 in the record and based on the proper legal standards.  Accordingly, IT IS RECOMMENDED

16 that plaintiff's Motion for Summary Judgment or Remand be denied, the Commissioner's Cross

17 Motion for Summary Judgment be granted, and Judgment be entered for the Commissioner.

18            These findings and recommendations are submitted to the United States District

19 Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten

20 (10) days after being served with these findings and recommendations, any party may file written

21 objections with the court and serve a copy on all parties.  Such a document should be captioned

22 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23 shall be served and filed within ten (10) days after service of the objections.  The parties are

24 \\\\\

25 \\\\\

26 \\\\\

19

1  advised that failure to file objections within the specified time may waive the right to appeal the

2  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 1/18/06

4                                          /s/ Gregory G. Hollows

5                                          _____
                                           GREGORY G. HOLLOWS
6  GGH/076                                 U.S. MAGISTRATE JUDGE

   Schiel2410.ss.wpd
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26